```
ESTADO LIBRE ASOCIADO DE PUERTO RICO
          TRIBUNAL DE APELACIONES
                 PANEL III
```

| | | |
|---|---|---|
| LIBERTY COMMUNICATIONS OF PUERTO RICO LLC Y LIBERTY MOBILE OF PUERTO RICO INC.<br><br>Recurrente<br><br>v.<br><br>EL NEGOCIADO DE TELECOMUNICACIONES DE LA JUNTA REGLAMENTADORA DE SERVICIO PÚBLICO<br><br>Recurrido | KLRA202400413 | Revisión procedente del Negociado de Telecomunicaciones de la Junta Reglamentadora de Servicio Público<br><br>Caso Núm.: NET-2024-PA-0001<br><br>Sobre: Impugnación facial a tenor con la Ley de Procedimiento Administrativo Uniforme con Relación a Emergency Order to Establish and Enforce Pole Attachment Fees and For Other Purposes |

Panel integrado por su presidente, el juez Figueroa Cabán, el juez Salgado Schwarz y el juez Monge Gómez

**Figueroa Cabán, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 30 de septiembre de 2024.

Comparece Liberty Communications of Puerto Rico LLC y Liberty Mobile of Puerto Rico, Inc., en adelante Liberty o las recurrentes, y nos solicitan que decretemos nula la *Orden NET-2024-PA-0001*, que emitió el Negociado de Telecomunicaciones de la Junta Reglamentadora de Servicio Público, en adelante NET o recurrido, el 27 de junio de 2024.[1] Mediante dicha *Orden*, el recurrido pretende regular varios asuntos relacionados con el uso de los postes públicos de tendido eléctrico que pertenecen a la Autoridad de Energía Eléctrica, en adelante AEE, y que son operados y administrados por LUMA Energy LLC y LUMA Energy Servco LLC, en adelante LUMA.

---

[1] La Orden fue registrada y notificada el 28 de junio de 2024.

Número Identificador

RES2024_____

Oportunamente, Liberty presentó un recurso de *Auxilio de Jurisdicción* en el que solicitó la paralización de los procedimientos relacionados a la Orden NET-2024-PA-0001 hasta que resolviéramos el *Recurso de Revisión Judicial*.

Así las cosas, decretamos Ha Lugar la petición de las recurrentes y suspendimos los procedimientos hasta tanto este tribunal dispusiera otra cosa. A su vez, le concedimos al recurrido un término de 30 días para que fijara su posición sobre el *Recurso de Revisión Judicial* presentado por Liberty.

En cumplimiento con lo ordenado, el recurrido presentó su escrito en oposición. Así pues, con el beneficio de su comparecencia, resolvemos.

-I-

La controversia que tenemos ante nuestra consideración surge como consecuencia de la *Resolución y Orden de Emergencia* que emitió NET el 27 de junio de 2024. El propósito de dicha *Resolución es*, "(i) establish and enforce pole attachment fees for the usage of government-owned Transmission and Distribution ("T&D") poles; (ii) resolve the allocation of equipment transfer costs related to the replacement of publicly-owned T&D poles, (iii) clarify new attachment and make-ready issues, and (iv) schedule an adjudicatory proceeding to address pole attachment matters".[2]

Como parte de las medidas para establecer y poner en vigor los objetivos previamente mencionados, NET ordenó lo siguiente:

---

[2] Apéndice de las recurrentes, pág. 1.

1. Within **sixty (60)** days of this Order, all attaching Providers and Unreported Attachers are **ORDERED** to produce, based on current and available records, a true and correct inventory of (i) the type and routing of all cables and equipment attached to T&D poles (including cables and equipment in disuse to be identified as such), and (ii) the quantity and location of all attachments to public T&D poles (the "Inventory Assessment"). Moreover, the Inventory Assessment must include a detailed Statement of Public Safety that identifies a corrective plan for all pole attachments that do not comply with applicable provisions of the National Electrical Safety Code ("NESC"). The Inventory Assessment must be submitted in a Geographic Information System ("GIS") mapping format. The Inventory Assessment must be submitted to the NET, by each Provider, with a certified declaration, under oath, stating that it includes all the information available and that it is a true and correct inventory of all its cables, facilities and equipment.

2. The NET **ORDERS** that all Providers and other companies in Puerto Rico with cable, Internet, or telecommunications attachments affixed to any T&D poles owned by PREPA and managed by LUMA must pay an annual attachment fee. All Providers and any other company with attachments must pay attachment fees in accordance with the following terms and conditions. The NET reminds LUMA and all Unreported Attachers that any attaching Provider must be certified and registered with the NET in order for them to be able to have third-party pole attachments on government-owned T&D poles.

   - The NET **ESTABLISHES** an attachment fee of **$8.65 per attachment** for FY2024 ("Interim Attachment Fee").
   - All Providers and Unreported Attachers with attachments on PREPA-owned T&D poles are **ORDERED** to make payment of the Interim Attachment Fee to LUMA (based on the most recent number of known attachments and thereafter adjusted based on the certified Inventory Assessment) in Installment Payments in accordance with the Schedule specified below. Payment of the Interim Attachment Fee must occur, regardless of having received an invoice from LUMA, with the First Installment due on or before August 30, 2024. The First Installment shall be in the amount of 10% of the assessed Interim Attachment Fee, with all remaining Installment Payments to be in the amount of 30% of the assessed Interim Attachment Fee, accordingly. All Provider and Unreported Attacher Installment Payments for the Interim Attachment Fee must be made in accordance with the following Schedule:

**Schedule:**

| Installment Payments | Due Date |
|---|---|
| First Installment (10%) | August 30, 2024 |
| Second Installment (30%) | September 30, 2024 |
| Third Installment (30%) | October 31, 2024 |
| Final Installment (30%) | December 31, 2025 |

   - The Interim Attachment Fee applies to FY2024 only. As discussed herein, the NET hereby schedules an adjudicatory proceeding to assess attachment variables and set any adjusted

attachment rate for FY2024, FY2025 and any applicable succeeding years.

3. The NET **ORDERS** that LUMA is the primary entity responsible for executing and completing, at its own expense and using all necessary resources, all transfers of pole attachment equipment from existing T&D poles to any newly constructed Replacement Poles.

   […]

4. To facilitate all attachment transfers, within **ten (10) days** from this Emergency Order, LUMA is **ORDERED** to provide the NET, and Providers, a comprehensive list of Replacement Poles, to date, indicating source of funding, location information, attachment quantity and status.

   To facilitate the reimbursement of FEMA funds, in the case of FEMA-Funded Poles that have already been installed by the notification date of this Emergency Order, the NET **ORDERS** all Providers to execute and complete the transfer of their pole attachments within **sixty (60) days** of this Emergency Order. In the case of the remaining Replacement Poles that have been installed by the notification date of this Emergency Order, the NET **ORDERS** all Providers to execute and complete the transfer of their pole attachments within **one hundred and twenty (120)** days. Each Provider must: (i) identify their attachments, (ii) coordinate with LUMA and (iii) successfully transfer their equipment to the Replacement Poles so that LUMA to be able to remove the old pole. **Failure to comply with the requirements of this Order may result in the NET imposing maximum penalties, to the full extent permitted by law, including a twenty-five thousand dollar ($25,000) fine, per violation.**

   […]

5. The NET **ORDERS** all Unreported Attachers to **immediately:** (i) identify themselves to both the NET and LUMA, (ii) obtain any required registration or certification with the NET to attach cable, Internet, or telecommunications equipment on public T&D poles, and (iii) otherwise adhere to all requirements outlined in this Emergency Order, as well as applicable law. **Failure to comply with any requirements may result in the NET imposing maximum penalties on the Unreported Attachers to the full extent permitted by law, including a twenty-five thousand dollar ($25,000) fine, per violation, per year.**

6. The NET **ORDERS** all Providers and Unreported Attachers to: (i) identify all cables and equipment in disuse, (ii) formulate a plan to remove the cables and equipment in disuse, and (iii) implement the plan to remove cables and equipment in disuse within **ninety (90) days** of this Order. **Failure to comply with the requirements of this Order may result in the NET imposing maximum penalties on the Provider to the full extent permitted by law, including a twenty-five thousand dollar fine ($25,000), per violation.**

   […]

7. The NET **ORDERS** LUMA to cease charging a $95 per pole application fee to Providers seeking to place new attachments on T&D poles.

8. Within **thirty (30)** days of this Order, LUMA is **ORDERED** to submit a proposal to the NET that includes a new permitting or application fee schedule that is

cost based and charged per application, not per pole. The NET, at its discretion, shall approve or deny LUMA´s proposal. LUMA shall not assess any application or permitting fee until such fee is approved by the NET.[3]

El recurrido dispuso que la *Resolución y Orden* sería efectiva inmediatamente.

Oportunamente, LUMA; Liberty; Puerto Rico Telephone Company d/b/a Claro; Neptunomedia, Inc. y Critical Hub Networks, Inc. presentaron solicitudes de reconsideración ante el NET.[4] Todos coincidieron en señalar, como uno de los motivos de reconsideración, que la recurrida había incumplido con el proceso de reglamentación dispuesto en la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*, en adelante la LPAU.[5]

Pendientes de resolver las mociones de reconsideración, Liberty acudió ante este tribunal intermedio mediante *Recurso de Revisión Judicial* en el que señaló la comisión de los siguientes dos errores:

ERRÓ EL NEGOCIADO AL PROMULGAR LA ORDEN NET-2024-PA-000 EN CONTRAVENCIÓN DE LAS SECCIONES 2.1, 2.2, 2.3, 2.4, 2.6, 2.8 Y 2.11 DE LA LPAU Y EL ARTÍCULO II-7(A) DE LA LEY 213 SOBRE EL PROCESO DE REGLAMENTACIÓN FORMAL.

ERRÓ EL NEGOCIADO [AL] PROMULGAR LA ORDEN NET-2024-PA-0001 PORQUE LA LEY 213 Y LA LEY FEDERAL, 47 U.S.C. § 224(C) NO LE CONFIEREN AL NEGOCIADO LA AUTORIDAD PARA REGULAR COLOCACIONES DE EQUIPO DE TELECOMUNICACIONES Y CABLE EN POSTES PÚBLICOS DE TENDIDO ELÉCTRICO BAJO EL CONTROL DE LUMA, UNA ENTIDAD PRIVADA.

Con el beneficio de las comparecencias por escrito de las partes y del examen de la copia certificada del expediente administrativo, estamos en posición de resolver.

---

[3] *Id.*, págs. 8-11.
[4] *Id.*, págs. 19-60, 70-106, 113-157, 158-166 y 167-193. (Énfasis en el original).
[5] *Id.*

**-II-**

El Poder Legislativo tiene la autoridad constitucional de delegar en las agencias administrativas el poder de adoptar reglas y reglamentos.[6] En lo aquí pertinente, se define como regla o reglamento:

> …[C]ualquier norma o conjunto de normas de una agencia que sea de aplicación general que ejecute o interprete la política pública o la ley, o que regule los requisitos de los procedimientos o prácticas de una agencia que tenga fuerza de ley. El término incluye la enmienda, revocación o suspensión de una regla existente. Quedan excluidos de esta definición:
>
> (1) Reglas relacionadas con la administración interna de la agencia o comunicaciones internas o entre agencias que no afectan los derechos o los procedimientos o prácticas disponibles para el público en general.
>
> (2) Documentos guía según definidos en este capítulo.
>
> (3) Órdenes de precios del Departamento de Asuntos del Consumidor y otros decretos u órdenes similares que se emitan o puedan emitir en el futuro por otras agencias, y que meramente realizan una determinación de uno o varios parámetros de reglamentación con base a un reglamento previamente aprobado y que contiene las normas para su expedición.
>
> (4) Formas y sus instrucciones, siempre que no constituyan documentos guía.[7]

En otras palabras, por medio del proceso de reglamentación las agencias crean normas de aplicación general que definen o interpretan la política pública o prescriben una norma legal. Bajo este supuesto, no se adjudican derechos u obligaciones de personas particulares.

---

[6] *Sierra Club et al. v. Jta. Planificación,* 203 DPR 596, 605 (2019).

[7] Sec. 1.3(m) de la Ley Núm. 38-2017 (3 LPRA sec. 9603).

Ahora bien, las reglas se clasifican en dos clases, a saber: reglas legislativas y reglas no legislativas.[8]

Las reglas no legislativas "constituyen pronunciamientos administrativos que no alteran los derechos ni las obligaciones de los individuos".[9] Estas, a su vez, se catalogan en dos categorías, a saber: las reglas internas y los documentos guías.

Específicamente, la LPAU define un documento guía como "un documento físico o electrónico de aplicabilidad general desarrollado por una agencia, que carece de fuerza de ley[,] pero expresa la interpretación de la agencia sobre alguna legislación, la política pública de la agencia o que describe cómo y cuándo la agencia ejercerá sus funciones discrecionales".[10] También incluye interpretaciones oficiales, pero excluye documentos que son reglamentos o reglas.[11] Es pertinente destacar que nuestro ordenamiento administrativo exime al documento guía de cumplir con los requisitos del proceso de reglamentación.[12]

En cambio, las reglas legislativas "crea[n] derechos, impone[n] obligaciones y establece[n] un patrón de conducta que tiene fuerza de ley".[13] A diferencia de las reglas no legislativas, por la importancia que revisten y el efecto que pueden

---

[8] *Sierra Club, et al. v. Jta. Planificación, supra.*
[9] *Mun. de Toa Baja v. DRNA*, 185 DPR 684, 696 (2012).
[10] Sec. 1.3(c) de la Ley Núm. 38-2017 (3 LPRA sec. 9603(c)). Véase, además, Sec. 2.20 de la Ley Núm. 38-2017 (3 LPRA sec. 9630).
[11] *Id.*
[12] *Sierra Club et al. v. Jta. Planificación, supra.* Véase además, Sec. 1.3(m) de la Ley Núm. 38-2017, *supra.*
[13] *Sierra Club et al. v. Jta. Planificación, supra*, pág. 605; *Asociación Maestros v. Comisión*, 159 DPR 81, 93 (2003); *Mun. de San Juan v. JCA*, 152 DPR 673, 692 (2000).

acarrear para el público en general, el proceso de reglamentación de las reglas legislativas debe cumplir con los siguientes requisitos establecidos en la LPAU[14], a saber: (1) notificar al público la reglamentación que se aprobará; (2) proveer oportunidad para la participación ciudadana, que incluya vistas públicas cuando sea necesario u obligatorio; (3) presentar la reglamentación ante el Departamento de Estado para la aprobación correspondiente; y (4) publicar la reglamentación aprobada.[15]

Hay que dejar claramente establecido que el cumplimiento con los requisitos previamente mencionados es imprescindible e ineludible.[16] Ello es así, porque la validez de la regla legislativa está atada a la observancia rigurosa del proceso de reglamentación. En otras palabras, la observancia del trámite de reglamentación "es indispensable para poder reconocerle fuerza de ley a la regla promulgada, ya que ello forma parte de las garantías procesales que permean todo el estatuto".[17] De modo que, "[s]i la regla o reglamento no se conforma y ajusta a lo establecido [en la LPAU], carecerá de fuerza de ley y estará sujeto a que se cuestione judicialmente. La agencia está impedida de sustituir el procedimiento de la ley so pena de que se vicie de nulidad la

---

[14] *Sierra Club et. al. v. Jta. Planificación*, *supra*; *Asociación de Maestros v. Comisión*, *supra*.

[15] Secs. 2.1, 2.2, 2.3, 2.8, y 2.11 de la Ley Núm. 38-2017 (3 LPRA secs. 9611-9613, 9618 y 9621). Véase, además, *Sierra Club et al. v. Jta. Planificación*, *supra*, pág. 606; *Centro Unido Detallistas v. Com. Serv. Púb.*, 174 DPR 174, 182 (2008); *Mun. de San Juan v. JCA*, *supra*, págs. 690-691.

[16] *Sierra Club et. al. v. Jta. Planificación*, *supra*; *Mun. de Toa Baja v. DRNA*, *supra*, pág. 695.

[17] *Sierra Club et al. v. Jta. Planificación*, *supra*, pág. 606; *Centro Unido Detallistas v. Com. Serv. Púb.*, *supra*, pág. 183.

reglamentación adoptada".[18] Por tanto, será nulo todo reglamento que se adopte en violación a las disposiciones de la LPAU.[19]

En otras palabras, la inobservancia de los requisitos procesales del trámite de reglamentación conlleva la impugnación de los reglamentos de su faz y en su aplicación. Esta impugnación facial del reglamento procede cuando la agencia administrativa ha incumplido sustancialmente con los requisitos que impone la LPAU para su adopción.[20]

Debemos mencionar que la causa de acción de impugnación reglamentaria solo se puede instar en estas circunstancias específicas, o sea, cuando se alega la violación de uno de los requisitos formales de la LPAU para la adopción de un reglamento legislativo.[21]

Esta norma judicial ha sido refrendada por el Tribunal Supremo de Puerto Rico que ha reconocido la procedencia de la impugnación facial de un reglamento cuando se alega el incumplimiento con las garantías procesales mínimas establecidas en la LPAU o el proceso de reglamentación allí dispuesto.[22] Sin embargo, este mecanismo no está disponible para ciudadanos "meramente interesados en solicitar la anulación de un reglamento que, en términos

---

[18] Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 3ra ed., Colombia, Ed. Forum, 2013, pág. 138.
[19] Sec. 2.7(a) de la Ley Núm. 38-2017 (3 LPRA sec. 9617(a)).
[20] Sec. 2.7(b) de la Ley Núm. 38-2017 (3 LPRA sec. 9617(b)). Véase, además, *Fuentes Bonilla v. ELA et al.*, 200 DPR 364, 377-378 (2018); *Centro Unido Detallistas v. Com. Serv. Púb.*, *supra*, págs. 183-184.
[21] *Centro Unido Detallitas v. Com. Serv. Púb.*, *supra,* pág. 186.
[22] *Id.*

procesales, cumplió sustancialmente con las exigencias de la [LPAU]".[23]

Por tratarse de reglas de aplicación general, la legitimación activa es amplia, de modo que cualquier persona tiene la capacidad para impugnar el incumplimiento con las disposiciones de la LPAU ante el Tribunal de Apelaciones, independientemente de si participó durante la celebración de las vistas públicas, formó parte de los procedimientos para su aprobación o si se ha visto afectada por la aplicación de dicha regla o reglamento.[24] Para ello, contará con un término de treinta (30) días contados a partir de su vigencia.[25]

Finalmente, existe un segundo tipo de impugnación de un reglamento. Esta acción de impugnación es distinta a la impugnación de su faz, pues se trata de un proceso que puede "entablar un ciudadano agraviado por la acción de una agencia, bien tras un procedimiento de adjudicación o a raíz de la aplicación de un reglamento que, a su entender, carezca de validez".[26]

Este proceso de impugnación adicional puede invocarse por cualquier persona afectada por la aplicación de un reglamento ante la agencia administrativa como parte del proceso adjudicativo formal o, en cualquier momento, en el Tribunal de

---

[23] *Id.*, pág. 189.
[24] *JP v. Frente Unido I*, 165 DPR 445, 462-463 (2005). "Es decir, en la impugnación de su faz de un reglamento "no se requiere demostrar una lesión a un interés individualizado del litigante para que proceda la revisión, ya que ésta busca invalidar el reglamento en toda circunstancia en que pueda ser aplicable". *Sierra Club v. Junta de Planificación, supra*, pág. 607; *Centro Unido Detallistas v. Com. Serv. Púb., supra*, pág. 186.
[25] Sec. 2.7 (b) de la Ley Núm. 38-2017, *supra*. Véase, además, *Sierra Club v. Junta de Planificación, supra*. *Centro Unido Detallistas v. Com. Serv. Púb., supra*, pág. 183.
[26] *Id.* pág. 185.

Primera Instancia, ya sea por razones constitucionales o por otros motivos.[27]

**-III-**

Para las recurrentes la Orden NET-2024-PA-0001 es una regla de carácter legislativo que crea derechos, impone obligaciones y establece un patrón de conducta que tiene fuerza de ley, que requería, antes de ponerla en vigor, so pena de nulidad, que se efectuara un proceso de reglamentación formal. En la alternativa sostiene, además, que NET carece de jurisdicción para regular las colocaciones de equipo de telecomunicaciones y cable en postes públicos de tendido eléctrico bajo el control de una entidad privada.

Por su parte, LUMA se opone parcialmente a la solicitud de revisión administrativa. Coincide con Liberty en que la Orden NET-2024-PA-0001 es una regla legislativa. En cambio, difiere con dicha parte en que, a su entender, NET tiene jurisdicción para regular colocaciones de equipos de telecomunicaciones en postes públicos de tendido eléctrico bajo el control de una entidad privada.

En cambio, el NET alega que tiene jurisdicción para regular las colocaciones de equipo de telecomunicaciones y cable en postes públicos de tendido eléctrico bajo el control de LUMA, porque aquellos pertenecen a la Autoridad de Energía Eléctrica, entidad del Gobierno de Puerto Rico, quien regula las tarifas, términos y condiciones de los postes.

---

[27] *Centro Unido Detallistas v. Com. Serv. Púb., supra*, págs. 184-185.

Además, el recurrido arguye, que dado a que existe una emergencia en el sistema de energía eléctrica de Puerto Rico, las Reglas 2.3, 3 y 38 del Reglamento Núm. 7848, Reglamento de Práctica y Procedimiento General, facultan al NET a iniciar un procedimiento adjudicativo de acción inmediata para establecer tarifas de fijación de postes en ausencia de la presentación de una querella formal.

A los efectos del resultado alcanzado, basta discutir el primer señalamiento de error.

Luego de revisar la Orden NET-2024-PA-1001 concluimos que la misma es de aplicación general a todos los componentes de la operación de fijar equipos de telecomunicaciones en postes del tendido eléctrico, bajo el control de LUMA.[28] Esto es así porque dicha Orden regula la operación previamente mencionada;[29] crea derechos y obligaciones;[30] impone tarifas;[31] e

---

[28] Véase, por ejemplo, **Inventory Assessment**.
**Within sixty (60) days of this Order, all attaching Providers and Unreported Attachers, are ORDERED to produce based on current and available records a true and correct inventory of (i) the type and routing of all cables and equipment attached to T&D poles (including cables and equipment in disuse to be identified as such)[…].** Apéndice de los recurrentes, pág. 8.
**Unreported Attachers**.
**The NET ORDERS all Unreported Attachers to immediately: (i) identify themselves to both the NET and LUMA, (ii) obtain any required registration or certification with the NET to attach cable, Internet, or telecommunications equipment on public T&D poles, and (iii) otherwise adhere to all requirements outlined in this Emergency Order, as well as applicable law.** *Id*., pág. 10.
[29] Véase, por ejemplo, **Emergency Resolution and Order**. **This** *Emergency Resolution and Order* **is issued by the Telecommunications Bureau of Puerto Rico of the Public Service Regulatory Board […] to: (i) establish and enforce pole attachment fees for the usage of government-owned Transmission and Distribution ("T&D") poles; (ii) resolve the allocation of equipment transfer costs related to the replacement of publicly-owned T&D poles, (iii) clarify new attachment and make-ready issues, and (iv) schedule adjudicatory proceeding to address pole attachment matters.** *Id*., pág. 1.
[30] Véase, por ejemplo, **Transfer Cost Allocations**.
**1. LUMA Responsibilities Relating to Prospective Transfers.**
**The NET ORDERS that LUMA is the primary entity responsible for executing and completing, at its own expense and using all necessary resources, all transfers of pole attachment equipment from existing T&D poles to any newly constructed Replacement Poles. […] Moreover, pole attachment related costs SHALL NOT be**

impone multas.[32]  En consecuencia, no nos cabe duda de que estamos ante una regla de naturaleza legislativa que tiene que cumplir, como condición de validez, con los requisitos establecidos en las secciones 2.1, 2.2, 2.3, 2.8 y 2.11 de la LPAU.[33]

Ahora bien, el recurrente parece estar conforme con esta clasificación jurídica. No le impugna. Sin embargo, alega que adoptó un procedimiento adjudicativo de acción inmediata, en lugar del proceso formal de reglamentación, porque "…[l]a urgencia de la situación, caracterizada por múltiples problemas críticos relacionados con el uso de postes de transmisión y distribución propiedad del gobierno, justificó plenamente esta medida. La Orden reconoció una emergencia significativa en la política pública de Puerto Rico, que afecta tanto a los proveedores de telecomunicaciones como a la infraestructura crítica de la isla".[34] No le asiste la razón, veamos.

Sin menospreciar el impacto adverso de la transformación del modelo energético sobre la sociedad y la economía de Puerto Rico, no estamos, desde el

---

[32] passed on to electric energy consumers by LUMA, including but not limited to surcharges, fees, or rate increases. […]
**2. Provider Responsibilities Relating to Transfers Involving Previously Installed Replacement Poles.**
**[…] LUMA is ORDERED to provide the NET, and Providers, a comprehensive list of Replacement Poles […].**
**[…] the NET ORDERS all Providers to execute and complete the transfer of their pole attachment within sixty (60) days […]** *Id.*, págs. 9-10.

[31]    Véase por ejemplo, **The NET ESTABLISHES an attachment fee of $8.65 per attachment for FY2024 ("Interim Attachment Fee")…** *Id.*, pág. 8.

[32] Véase por ejemplo, **Unreported Attachers**.
**[…] Failure to comply with any requirements may result in the NET imposing maximum penalties on the Unreported Attachers to the full extent permitted by law, including a twenty-five thousand dollar ($25,000) fine, per violation, per year.**
**Facilities in Disuse**.
**[…] Failure to comply with the requirements of this Order may result in the NET imposing maximum penalties on the Provider to the full extent permitted by law, including a twenty-five thousand dollar fine ($25,000), per violation.** *Id.*, pág. 10.

[33] (3 LPRA secs. 9611, 9612, 9613, 9618 y 9621).

[34] *Moción en Cumplimiento de Resolución*, pág. 10.

punto de vista del derecho administrativo, en la circunstancia extraordinaria que requiera prescindir de los procedimientos ordinarios ante una agencia.[35] En otras palabras, no está en juego un interés apremiante del Estado en preservar la salud y el bienestar de la ciudadanía que requiera acción inmediata del Estado y que por lo tanto no pueda protegerse mediante los mecanismos del proceso gubernamental ordinario.[36]

Sobre el particular, no debemos olvidar que "…la Sec. 3.17 no provee autorización para legislar, sino para adjudicar excepcional y sumariamente en situaciones particulares que justifiquen la acción inmediata de la agencia. Por lo tanto, la referida disposición *no autoriza a las agencias a legislar normas reglamentarias que contravengan directamente las garantías procesales mínimas que establece la LPAU…*".[37]

Reiteramos, como residentes de Puerto Rico, que hemos experimentado las molestias, pérdidas económicas e inconvenientes que la fragilidad del sistema de electricidad ha causado. Sin embargo, desde la perspectiva del derecho administrativo, esta situación no constituye una "urgencia suficientemente fuerte"[38] que exija inmediata actuación. Es decir, a pesar de su importancia y del impacto sobre nuestra sociedad, la inestabilidad del sistema de generación de energía eléctrica en Puerto Rico no reviste "la urgencia"

---

[35] *López Rivera v. Adm. de Corrección*, 174 DPR 247 (2008).
[36] *Id*.
[37] *Id*. (Énfasis en el original).
[38] *San Gerónimo Caribe Proyect v. ARPe*, 174 DPR 640 (2008).

"necesidad" o "prisa"[39] que nuestro ordenamiento administrativo requiere para circunvalar los procedimientos extraordinarios ante una agencia.

Como el NET reconoce, la crisis del sistema de energía eléctrica en Puerto Rico lamentablemente es el resultado de múltiples problemas que se han ido configurando durante varias generaciones. Sin embargo, en el ámbito del derecho administrativo, no representa un peligro inminente para la salud, la seguridad o el bienestar público.[40] Con este calvario la sociedad puertorriqueña ha tenido que vivir al menos desde el paso de los huracanes Irma y María por Puerto Rico.

Sobre el particular conviene destacar, que "[i]n the emergency cases, adverse effect may occur **immediately**. The public interest in dealing with the **emergency** justifies summary action which may take effect at once. Emergency permits **instant** closing of the unsafe mine, seizure and sale taxpayer´s property, and takeover of the bank; any hearing comes after this drastic acts have taken place".[41]

En resumen, el problema del sistema eléctrico en Puerto Rico es uno complejo que contiene varios elementos, tales como la generación, la distribución y la colocación de equipos de telecomunicaciones en postes de tendido eléctrico. Ninguno de esos componentes, ni aislada, ni integradamente, son susceptibles de la solución instantánea, drástica, e

---

[39] *Id.*
[40] *López Rivera v. Adm. de Corrección*, 174 DPR 247 (2008).
[41] *San Gerónimo Caribe Proyect v. ARPe*, *supra* (citando a B. Schwartz, Administrative Law, 3ra ed., Ed. Little, Brown and Co., 1991, pág. 246). (Énfasis suplido).

inmediata, típica de un procedimiento adjudicativo de acción inmediata. Por el contrario, requieren soluciones a largo plazo.[42] Por lo tanto, nada impide al recurrido regular el elemento del problema ante nuestra consideración mediante el procedimiento formal de reglamentación regulado por LPAU.

**-IV-**

Por lo fundamentos previamente expuestos, se revoca la resolución recurrida y se declara nula la Orden NET-2024-PA-0001.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[42] Como cuestión de hecho, la Orden impugnada no disponía una medida drástica a corto plazo. Por el contrario, contemplaba la recalendarización de los procedimientos en **un término de sesenta días contados a partir de su emisión**, es decir, 28 de junio de 2024.